LEE, P.J.,
for the Court:
PROCEDURAL HISTORY
¶ 1. Loni Marie Rutland was convicted in the Circuit Court of Franklin County of felonious child abuse. Rutland was sentenced to twenty years in the custody of the Mississippi Department of Corrections, with ten years suspended and ten years to serve.
¶ 2. Rutland now appeals, asserting the following issues: (1) the trial court erred in denying her motion for a judgment notwithstanding the verdict; (2) the verdict is against the overwhelming weight of the evidence; and (8) the trial court erred when it failed to grant a new trial due to juror misconduct. Finding no error, we affirm.
FACTS
¶ 3. While in Rutland’s care, Rutland’s seventeen-month-old daughter, A.T.,[1] suffered several injuries, including a fractured skull and broken leg. Rutland and A.T. lived with Rutland’s sister, but they also stayed two to three nights a week with Rutland’s boyfriend, Andrew Jones, *189 who lived. with his parents in Franklin County.
¶ 4. According to Rutland and Jones, on August 1, 2006, A.T. fell off a three-foot plastic slide and landed on her head. Later that night, Rutland noticed bruising under A.T.’s eyes. She took A.T. to a local clinic the next morning. A.T. was diagnosed with a sinus infection and prescribed antihistamine. Rutland testified that when they returned home, A.T. was disoriented from the medicine, tripped over a puppy, and struck her head on an end table. Rutland and Jones took A.T. to the hospital, where A.T. saw Dr. Kevin Hubbard. A CAT scan was taken of'A.T.’s head. Rutland and Jones testified that they were told the CAT scan results were blurry, but from what the doctor could tell, the results were normal. Dr. Hubbard instructed Rutland to give A.T. Tylenol for pain and follow up with her doctor the next day. Rutland testified that she did not read the instructions on the discharge papers and did not go to a follow-up appointment.
¶ 5. On August 27, 2006, A.T. was again taken to the hospital after she woke up crying and would not walk on her left leg. Rutland testified she noticed the day before that A.T.’s left ankle was swollen. Rutland attempted to treat the swelling at home with ice packs. An X-ray showed three breaks in A.T.!s left leg and dislocation of her left-ankle joint. A.T. was seen by Dr. Hubbard. Rutland explained the breaks by telling Dr. Hubbard that A.T. would sometimes put her legs through the slats in her crib. Rutland also testified that A.T. had fallen several times while running in the yard at Rutland’s sister’s houses and A.T. possibly injured her leg then. Dr. Hubbard inquired about a large bruise on A.T.’s forehead. Rutland explained that A.T. would sometimes hit her head against the crib. Rutland also stated that A.T. had fallen into the side of an end table.
¶ 6. Unsatisfied with Rutland’s explanations of the injuries, Dr. Hubbard requested a consultation with social services. Rutland became defensive when questioned by social workers and told them that she took care of her child “twenty-four/seven,” and she did not injure A.T.
¶ 7. After the consultation, A.T. was taken to the University of Mississippi Medical Center (UMMC), where Dr. Kevin Keaton performed a full-body CAT scan. The scan revealed fractures on both sides of A.T.’s skull in addition to the fractures to her left leg and the dislocation of her ankle. Surgery was performed on her leg and ankle the next morning. It was determined that the fractures had occurred recently. The Mississippi Department of Human Services sent a sheriffs deputy to inspect Rutland’s home. Photographs were taken of the end table and crib. The sides of the crib where A.T. slept were lined with blankets and pillows.
¶ 8. Rutland was indicted on two counts of felony child abuse. Count I addressed the facial and head injuries, and Count II addressed the injury to A.T.’s leg. The trial court found that insufficient evidence was presented regarding the cause of A.T.’s head injuries and granted a directed verdict in favor of Rutland as to Count I. The jury found Rutland guilty of Count, II.
DISCUSSION
I. SUFFICIENCY OF THE EVIDENCE
¶ 9. Rutland argues that the trial court erred in failing to grant her motion for a judgment notwithstanding the verdict because the State failed to introduce sufficient evidence at trial to establish that she intentionally abused A.T.
*190 ¶ 10. In Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005), the supreme court stated the following regarding the standard of review for sufficiency of the evidence:
[I]n considering whether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict or for [a] judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows “beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.”
(Quoting Carr v. State, 208 So.2d 886, 889 (Miss.1968)).
¶ 11. Mississippi Code Annotated section 97 — 5—39(2)(a) (Rev.2006) states, in part, that:
Any person who shall intentionally (i) burn any child, (ii) torture any child or, (iii) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse of a child....
Following this code section, the jury was instructed to return a guilty verdict if it found that Rutland, on or about August 27, 2006, “[ijntentionally whipped, struck or otherwise abused in such manner as to cause serious bodily harm, not in self-defense or in defense of others ... [to A.T.], a child, by causing fractures to the child’s leg....”
¶ 12. Dr. Hubbard, the emergency-room physician on duty on August 27, 2006, testified for the State. Dr. Hubbard testified that A.T. was brought to the hospital because her left foot and ankle were swollen, and she would not walk on it. Rutland told Dr. Hubbard that A.T. had possibly injured the leg two days earlier while running in her sister’s yard, but she had walked on it until the day before the hospital visit. Rutland also told him that A.T. sometimes put her feet through the slats in her crib and could have twisted her leg, but she could offer no definite explanation. Dr. Hubbard testified that none of Rutland’s explanations were plausible. As for breaking her leg in the slats of her crib, Dr. Hubbard testified: “The injury is too severe for that to happen. [It][w]ould be so painful that the child wouldn’t pull [his/her] foot through.” He also stated that Rutland’s statement that A.T. continued to walk on the leg after it was injured was not plausible. He stated: “That would be a non-walking injury. There’s no way ... [she] could walk on that.”
¶ 13. Dr. Hubbard went on to testify that five red flags came up in his examination of A.T. Dr. Hubbard stated that the following factors were signs of child abuse: “the absence of a good history of the injury”; “injuries that could be avoided if they had better care or supervision”; “[h]istory of repeated injury from the same month, previous injury”; “[d]elay in seeking care”; and “the fact the baby was premature.”
¶ 14. Dr. Lawrence Haber, a pediatric orthopedic surgeon at UMMC, also testified for the State. Dr. Haber examined A.T. when she was brought to the pediatric intensive care unit, and he later performed surgery on her leg. Dr. Haber determined that the break was fresh, meaning that it had happened within the past few days to a week. Dr. Haber testified that it would be “almost impossible” for a child to walk with such a severe leg injury. When questioned about the cause of the injury, Dr. Haber stated:
[W]hen you look at that x-ray, it’s suspect to begin with as far as child abuse.... That’s just a violent injury for a child that age. A seventeen- *191 month-old child can’t do that to themselves without a — you know — without a high energy type injury. When I say high energy, I mean fall from ... at least six to eight feet minimum if not higher or a car accident.
When asked if it would be possible for the injury to have occurred in one of the scenarios Rutland described, Dr. Haber responded: “No. I mean, a child can’t do that to themselves.... [Y]ou don’t get that type of injury with a simple fall or a trip.” He stated that the injury was most consistent with a “leg getting caught in something and someone ripping [him/her] through, or someone — you know — swinging the child from that leg. Those sorts of things. If someone drops a child or ... [t]hrow[s] a child.”
¶ 15. Jan Thurman, a social worker, testified for the State. Thurman questioned Rutland at the hospital about A.T.’s injuries. Thurman testified that Rutland became defensive and stated that she would never hurt her child. Thurman asked Rutland if A.T. was ever left with anyone else, and Rutland responded that A.T. was in her care “twenty-four/seven.”
¶ 16. Since no direct evidence of child abuse was presented, the State based its case on circumstantial evidence from A.T.’s treating physicians and two social workers. The jury was instructed that a verdict based on circumstantial evidence “must be so strong as to exclude every other reasonable hypothesis other than that of guilt.” Considering the evidence in the light most favorable to the State, we find the evidence presented was sufficient to show, to the exclusion of every other reasonable hypothesis, that Rutland’s actions resulted in A.T.’s leg injuries. Both doctors testified that the possible scenarios given by Rutland for A.T.’s injuries were not plausible, and Rutland, who maintained that A.T. was constantly under her supervision, offered no other plausible explanation for the injuries. We find that any rational juror could have found beyond a reasonable doubt that all of the elements of felonious child abuse were proven by the State. This issue is without merit.
II. WEIGHT OF THE EVIDENCE
¶ 17. Rutland next argues that the trial court erred in denying her motion for a new trial because the State failed to present any evidence that she committed the crime charged. Rutland also contends that her case should be reversed and remanded for a new trial due to juror misconduct.
¶ 18. “A motion for a new trial challenges the weight of the evidence.” Beckum v. State, 917 So.2d 808, 812 (¶ 10) (Miss.Ct.App.2005). “When reviewing a trial court’s denial of a motion for a new trial, this Court must consider the evidence in the light most favorable to upholding the verdict.” Id. at 818 (¶ 14) (quoting Carr v. State, 774 So.2d 469, 472 (¶ 15) (Miss.Ct.App.2000)). “We must keep in mind that it is the jury’s responsibility to resolve matters regarding the weight of the evidence and the credibility of witnesses.” Id. (quoting Carr, 774 So.2d at 472 (¶ 15)). “[W]e will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844 (¶ 18). The appellate court sits as a hypothetical “thirteenth juror.” Id. If, in this position, the Court disagrees with the verdict of the jury, “the proper remedy is to grant a new trial.” Id.
¶ 19. While the jury was not presented with any direct evidence, we find that sufficient circumstantial evidence was presented for the jury to find Rutland guilty of felonious child abuse. Rutland repeatedly stated that A.T. was in her care *192 “twenty-four/seven.” Expert testimony was presented that A.T.’s injury could have only been caused by a high-energy impact. Dr. Hubbard and Dr. Haber testified that Rutland’s explanations of how the injury occurred were not plausible. The doctors also testified that it would be highly unlikely for a child to walk around for two days with such a severe injury. Finally, Dr. Hubbard testified that he saw multiple red flags indicating child abuse.
¶ 20. In situations where the State’s case is based wholly upon circumstantial evidence, the State is required to prove the defendant guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. Johnson v. State, 999 So.2d 360, 367 (¶ 29) (Miss.2008). The jury was properly instructed on circumstantial evidence, and we find that the jury’s verdict is supported by the overwhelming weight of the evidence. Therefore, we find that this issue is without merit.
III. JUROR MISCONDUCT
¶ 21. After the jury had been deliberating for approximately fifty minutes, the jury submitted a note to the trial court asking the following question: “Is negligence the same thing as abuse?” The trial judge determined that it was not proper for the court to answer the question. The trial judge wrote a note to the jury that stated: “You must rely on the Court’s instructions on the law already given to you. Please continue with your deliberations.” The jury returned a guilty verdict approximately twenty-five minutes later.
¶ 22. After the trial, Rutland filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. In that motion, Rutland alleged that it had come to her attention that a juror had looked up the words “neglect” and “abuse” in the dictionary at the conclusion of the first day of trial. The juror shared the definitions with the rest of the jury the following day. After the jurors heard the definitions, they determined that “neglect” and “abuse” had the same meaning. Rut-land argues that a new trial should be granted because the jury failed to follow the trial court’s instruction to rely only on the instructions of law already given.
¶ 23. In response to Rutland’s claim of juror misconduct, the State interviewed one of the jurors regarding whether or not dictionary definitions were discussed by the jurors. The juror stated that one of the jurors did look up the definitions of “abuse” and “neglect” and brought the definitions into the jury room. The State argues that the use of standard dictionary definitions did not prejudice Rutland; therefore, the motion for a new trial should be denied.
¶ 24. Rutland argues this case is analogous to Collins v. State, 701 So.2d 791, 797 (¶ 22) (Miss.1997), where Anthony Collins’s murder conviction was reversed and remanded for a new trial after the trial court gave the jury a Black’s Law Dictionary in response to the jury’s request for a legal definition. The supreme court stated that when a jury is presented with an extraneous influence, “we require that the party seeking the relief show prejudice.” Id. at 795 (¶ 14). However, “[a]ny material sent into the jury room by the judge carries with it the imprimatur of authority and rises almost to the level of a jury instruction.” Id. Therefore, when the trial judge is the one who presents an outside source to the jury, “a presumption is raised that prejudice flows from the injection of such an extraneous influence.” Id. at 796 (¶ 20). The supreme court went on to find that:
The action of a trial judge in giving instructions to a jury or sending evidence to a jury for consideration is sub *193 stantially and qualitatively distinct from the jury’s improper use of law books discovered in the jury room or an extraneous influence injected by an outside party and requires a more stringent standard.

Id.

¶25. We find that this case is distinguishable from Collins. First, the definitions were not presented to the jury by the trial court; thus, the more stringent standard in Collins is not applicable. Second, the supreme court has held that “there is a difference between a standard dictionary and a law dictionary in that a standard dictionary is less likely to improperly instruct a jury on the laws of the State of Mississippi.” Wilcher v. State, 863 So.2d 719, 772 (¶ 206) (Miss.2003).
¶ 26. We cannot find that any prejudice resulted from the jury reading the definitions. In its order denying the motion for a new trial, the trial court found nothing inherently prejudicial about the dictionary definitions of “abuse” and “neglect.” The trial court noted that “jurors do not deliberate and decide cases in a vacuum.... The dictionary definition of the two words is clearly something within the collective intelligence and common knowledge of any jury.” We agree with the trial court. Rutland has not shown that she was prejudiced by the jury hearing the definitions of the two words. This issue is without merit.
¶ 27. THE JUDGMENT OF THE FRANKLIN COUNTY CIRCUIT COURT OF CONVICTION OF FELONIOUS CHILD ABUSE AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH TEN YEARS SUSPENDED AND TEN YEARS TO SERVE, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO FRANKLIN COUNTY.
KING, C.J., MYERS, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.

. In order to protect the identity of the minor child, this Court has substituted initials in place of the child’s name.